## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### Urbana Division

| | |
|---|---|
| **ALBERT MOORE,** ) | |
| **Plaintiff,** ) | |
| **v.** ) | |
| ) | **Case No.  08-2018** |
| **COMMISSIONER OF SOCIAL SECURITY,** ) | |
| **sued as Michael J. Astrue,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

In September 2007, Administrative Law Judge (hereinafter "ALJ") Alice Jordan denied Plaintiff Albert Moore's applications for disability insurance benefits and supplemental security income benefits.  The ALJ based her decision on findings that Plaintiff was not disabled within the meaning of the Social Security Act and he is capable of performing his past job as a fast food restaurant cook as well as a number of other jobs that exist in the national economy.

In January 2008, Plaintiff filed a Complaint for Judicial Review (#3) against Defendant Michael Astrue, the Commissioner of Social Security, seeking judicial review of the final decision by the Regional Commissioner of the Social Security Administration denying benefits. In June 2008, Plaintiff filed a Motion for Summary Judgment or Remand (#11) and in August 2008, Defendant filed a Motion for an Order Which Affirms the Commissioner's Decision (#14). In September 2008, Plaintiff filed a Short Reply in Support of His Motion for Summary Judgment or Remand (#15).  After reviewing the administrative record and the parties' memoranda, this Court recommends, pursuant to its authority under 28 U.S.C. § 636(b)(1)(B), that Plaintiff's Motion for Summary Judgment or Remand **(#11)** be **DENIED**.

### I.  Background

### A.  Procedural Background

Plaintiff applied for benefits in October 2003, alleging disability beginning June 2003 due to arthritis, heart surgery, bad back, bad ankles, and sore muscles.  (R. 106.)  The Social

Security Administration denied the applications initially (March 2004) and upon reconsideration. Plaintiff appealed and ALJ Jordan held a hearing in June 2007, at which Plaintiff and a vocational expert testified.  An attorney represented Plaintiff at the hearing.  At the hearing, Plaintiff's attorney asked the ALJ to order a mental status examination including intelligence testing.  (R. 293.)  Dr. William Hilger performed this examination in August 2007.  (R. 240-42.) In September 2007, ALJ Jordan denied Plaintiff's applications for benefits based on findings that Plaintiff was not disabled within the meaning of the Social Security Act and he is capable of performing his past job as a fast food restaurant cook as well as a number of other jobs that exist in the national economy.  Plaintiff then filed a request for review of the hearing decision, which the Appeals Council denied in November 2007, making the ALJ's decision the final decision of the Commissioner.  Plaintiff subsequently appealed the decision to this Court.

### B.  Plaintiff's Background

Plaintiff was born in January 1957.  He was 46 at the time he applied for benefits and 50 at the time of the hearing.  He is just under six feet tall and weighs 258 pounds.  He is married with a young child.  He has completed eight years of school in special education classes.

Plaintiff last worked in June 2003.  (R. 107.)  His jobs were often short term, lasting for a period of months.  His full-time jobs include work as a spot welder from February 1993 to November 1996, as a material handler from October 1997 to May 1998, as a fast-food cook from May 1998 to August 1999, and as a dishwasher at a restaurant from August 1999 to December 1999.  (R. 107.)  He worked sewing sleeves on a factory line, a job he held from May 2000 through May 2002.  (R. 129.)  He worked as a dishwasher from December 2002 through January 2003 and as a rest area janitor for a cleaning service from April 2003 to June 2003.  He reported that he worked at least eight hours a day on these jobs, and at least 40 hours a week. (R. 107.)  One social security report describes his work as being sporadic with all jobs being of a very temporary nature and all unskilled work.  (R. 115.)

2

Plaintiff has had heart disease for many years.  He experienced a myocardial infarction and underwent five-vessel coronary artery bypass surgery in June 2001.  At a follow-up appointment in August 2001, Nurse Cheryl Mangers discussed his general health and his recovery from surgery.  She noted that he was obese and had high cholesterol.  She emphasized the need for him to quit smoking entirely and to follow a low fat, low cholesterol diet.  She reported that he was released to work part-time on September 10 and full-time on September 24, 2001.  (R. 202.)  Plaintiff later reported that, after his surgery, he was able to lift about 40 pounds at work.  (R. 207.)

In August 2001, Plaintiff was lifting a box and felt a crack in his sternum.  Dr. Ira Lebenson examined him and advised him not to lift anything heavy.  In September 2001, Dr. Lebenson noted that Plaintiff was improving and that he could return to work provided that he not lift anything weighing more than 20 pounds.  (R. 201.)  Dr. Lebenson subsequently diagnosed Plaintiff with sternal nonunioin and determined that he was a candidate for sternal rewiring.  (R. 200, 225.)  In January 2002, Dr. Lebenson performed surgery to rewire Plaintiff's sternum.  (R. 200, 227.)  At that time, he noted that Plaintiff was obese.  (R. 227.)  After surgery, Dr. Lebenson told Plaintiff not to lift anything more than ten pounds for six weeks.  (R. 230.)  In February and April 2002, Dr. Lebenson examined Plaintiff and reported that he was doing well after the sternal rewiring and he had no complaints.  (R. 199-200.)  In April 2002, Dr. Lebenson gave Plaintiff a note stating that he could return to work with full activities.  (R. 199.)

There is no record of medical treatment from April 2002 to January 2004.

In January 2004, Dr. Kaushik Patel, a specialist in pulmonary critical care medicine, examined Plaintiff in connection with his applications for disability.  He noted Plaintiff's history of bypass surgery in 2000 and stated that Plaintiff's chest pain resolved after the surgery.  He noted Plaintiff's history of surgery for sternal dehiscence and stated that Plaintiff's wound healed after six to seven months.  Plaintiff's blood pressure was 144/100 and 150/104 upon repeat, and he weighed 271 pounds.  Plaintiff reported no angina pain, but he told Dr. Patel that it feels like

his chest muscles are being pulled when he lifts more than a gallon of milk.  Dr. Patel noted a two-inch palpable gap in Plaintiff's sternum.  Plaintiff also complained of sore arm muscles, swelling in his ankles, and having his ankles go out of joint at times.  Plaintiff reported that he could walk about a block and then he experiences shortness of breath and his knees and ankles feel like they are going out.  He can climb 15 steps and stand for about two hours. He has no problems with sitting.  The doctor found mild edema below the knees bilaterally, mild swelling of the right knee, reduced flexion, and reduced range of motion in his knees that was worse on the right side.  However, he reported normal strength, tone, reflexes, gait, hand grasp, and finger movements.  He diagnosed Plaintiff with sternal dehiscence, elevated blood pressure, hypercholesterolemia, and arthralgias in the knees with limited range of motion in his right knee. Dr. Patel recommended that Plaintiff follow up with his doctor with regard to the sternal dehiscence, elevated blood pressure, and arthralgias in his knees.  (R. 207-9.)

An x-ray taken in January 2004 indicated no abnormalities in Plaintiff's lumbar spine. (R. 210.)

In March 2004, Dr. Stanley Burris completed a Physical Residual Functional Capacity (hereinafter "RFC") form for Plaintiff.  He reported that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk for 6 hours in an 8-hour day, and sit for 6 hours in an 8-hour day.  He had no limits on his ability to push or pull, no communicative, environmental, manipulative, or visual limitations, and no postural limitations except that he could never climb ramps, ladders, ropes, scaffolds, or stairs.  Dr. Burris noted that Plaintiff complained of back pain, but his January 2004 x-rays were normal.  Plaintiff reported no chest pain.  Dr. Burris noted that Plaintiff weighed 271 and was obese.  He noted that Plaintiff had surgery for sternal dehiscence that healed, but the wires broke later, leaving him with a two-inch gap with skin intact.  Finally, he stated that the consulting doctor, Dr. Patel, had advised Plaintiff to see his doctor for treatment of high blood pressure and obesity.  (R. 211-18.)

**4**

In May 2004, Dr. Kurt Dearnbarger treated Plaintiff for complaints of chest and upper right arm pain and arthritis in his knees.  The doctor prescribed Naprosyn for pain.  He also indicated that Plaintiff should get x-rays on his knees in the future and stated that Plaintiff "needs to be on disability."  (R. 251.)  The report of a subsequent chest x-ray stated "[m]edian sternotomy wires and clips are present consistent with prior coronary artery bypass graft surgery" (R. 252), indicating that the sternal wires were intact.

In June 2004, Plaintiff returned to Dr. Dearnbarger with continued complaints of chest pain.  Plaintiff had not taken Naprosyn because he could not afford it, so the doctor provided Vioxx samples.  The doctor reported that Plaintiff's x-rays were normal and his heart rate and rhythm were regular.  The doctor also stated that "[h]e is to not work any get disability if possible."  (R. 250.)  At a follow-up appointment in July 2004, Plaintiff reported that the Vioxx had helped.  The doctor gave him more Vioxx, and prescribed Naprosyn, and also recommended that Plaintiff see another cardiologist.  (R. 249.)  In September 2004, Plaintiff complained again of chest pain and also told the doctor his arthritis was bothering him.  The doctor gave him more Vioxx.  (R. 243.)

In August 2007, Dr. William Hilger, a DDS-selected doctor, performed psychological testing on Plaintiff.  (R. 240-42.)  He reported that Plaintiff "tended to respond slowly but tended to put forth adequate effort and persistence."  (R. 240.)  Plaintiff scored a verbal IQ of 75, a performance IQ of 76, a full-scale IQ of 73, and a GAF of 60-65.  Dr. Hilger indicated that Plaintiff's performance placed him in the borderline slow learner range with some potential extending into the low average range.  He reported that Plaintiff "shows at least borderline mental potential to perform work related activities involving understanding and memory, sustained concentration and persistence, social interaction, and adaption.  He would be limited to fairly simple, repetitive, and unskilled types of work duties depending on his physical limitations."  (R. 242.)

**C.  Testimony at the Hearing**

At the hearing, Plaintiff testified that he was 50 years old, weighed 258 pounds, and was 5 feet 11-1/2 inches tall.  He lives with his wife and 14-month-old child.  He drove to the hearing.  He went to school through the eighth grade.  He testified that he last worked in January 2002 as a janitor and groundskeeper at a highway rest area.  He stopped working because the company he worked for lost the contract.  In January 2002, he tore his chest muscles lifting 80-pound bags.  (R. 278-80.)  Plaintiff testified that he has been disabled since he had heart surgery, although his alleged disability onset date is June 30, 2003.  (R. 281.)

Plaintiff stays home and takes care of his 14-month-old daughter.  He does laundry, cooking, cleaning, vacuuming, and childcare.  His daughter weighs 22 pounds; he lifts her by going down on one knee and using his arms to embrace her.  Plaintiff watches television six or seven hours a day and reads the Bible and other material.  He goes grocery shopping with his wife.  He has a driver's license.  His only hobby is fishing, but he has not gone fishing for two years.  He smokes about a half a pack a day.  He does not drink or take any drugs other than aspirin and painkillers.  He is currently taking over-the-counter ibuprofen and aspirin.  He experiences no side effects from the medication.  (R. 285-88.)

Plaintiff testified that he is unable to work because he has no babysitter for his child and also because of the pain in his chest.  When he is sitting, he has to get up every hour or so because of the circulation in his legs.  He can stand for about 45 to 50 minutes before he has to sit down.  He cannot walk far, even around the block.  He can lift about 18 to 19 pounds.  If he bends over too fast, his lower back pops and then it hurts for three or four days.  His knees bother him when he climbs stairs.  He has rheumatoid arthritis in every joint and cholesterol cataracts.  He takes Aleve for his arthritis when he can afford it, but he has not taken it for two and a half weeks.  (R. 288-90.)  Plaintiff also testified that after he stands for 45 to 50 minutes, the backs of his legs hurt and he has to sit down and rub them for 35 to 40 minutes to get them to stop hurting.  (R. 297.)

6

Bob Hammond, a vocational expert (hereinafter "VE"), also testified.  He based his testimony on an assumption that Plaintiff had an eighth grade education.  The VE testified and Plaintiff confirmed that Plaintiff had worked as a cook, furniture mover, dishwasher, spot welder, sewer, janitor, and material handler.  The ALJ then asked about a hypothetical person, age 46, with an eighth-grade education and the same past relevant work as Plaintiff, restricted to medium to light work with no climbing.  The VE testified that this hypothetical individual could perform the jobs of cook, sewer, dishwasher, spot welder, and material handler.  The sewer job is light work; the other jobs are medium.  The sewer position is semi-skilled and the cook position is skilled.  A fast food cook would require less skill than a cook.  The ALJ then limited the hypothetical individual to light work, and the VE testified that the individual could perform a number of jobs available in the economy including fast food worker and housekeeper, among others.  Those two jobs are light work and have an Specific Vocational Preparation[1] (hereinafter "SVP") score of 2.  (R. 294-96.)

When asked what effect the fact that the hypothetical individual only has an eighth-grade education would have on his answers, the VE testified that it would limit the individual to entry level positions with an SVP of 2, doing simple, repetitive tasks and activities.  The VE testified that he had included the fast food worker and the housekeeper job in that category because people who have not graduated from high school often perform those jobs.  The VE also testified that the jobs he had mentioned all involved simple, repetitive work.  None of the jobs would accommodate the ability to sit down during the job.  (R. 297-98.)

At the hearing, Plaintiff's attorney asked the ALJ to order a mental status examination including intelligence testing.  (R. 293.)  Dr. William Hilger performed this examination in August 2007.  (R. 240-42.)

---

[1]The SVP score indicates roughly how much time a job takes to learn.  A job with an SVP of 1-2 requires 30 days or less to learn.  An SVP of 3-4 indicates that the job requires 30-90 days to learn, and an SVP of 5-6 indicates that the job requires 90 days or more to learn.  SSR 00-4p.

### D.  The ALJ's Decision

To be entitled to social security disability benefits, a plaintiff must show that he is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 416(i)(1).  To determine disability, the Commissioner uses a five-step sequential evaluation.  He determines:  (1) whether the claimant is presently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment, that is, one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his past relevant work; and (5) if the claimant cannot perform the past work, whether the claimant can do other jobs that are available in the national economy.  Between steps three and four, the ALJ determines the claimant's residual functional capacity, that is, the work he is still able to perform despite limitations.  20 C.F.R. § 404.1545. The claimant bears the burden of production and persuasion at steps one through four.  Once the claimant shows he is unable to perform past work, the burden shifts to the Commissioner to show that the claimant is able to engage in some other type of substantial gainful employment. *Campbell v. Shalala*, 988 F.2d 741, 743 (7th Cir. 1993).

The ALJ's decision followed this five-step process.  At the first step, the ALJ found that Plaintiff has not been engaged in substantial gainful activity since the onset of disability.  At the second step, the ALJ determined that Plaintiff had severe impairments including heart disease, arthritis, and borderline intellectual functioning.  (R. 22.)  At the third step, the ALJ determined that Plaintiff's condition did not meet or medically equal any of the impairments listed in the Regulations.  (R. 23.)  The ALJ determined that Plaintiff had the RFC to perform light to medium work, limited to simple, repetitive job tasks associated with unskilled work.  (R. 25.) Based on this RFC, at step four, the ALJ determined that Plaintiff was capable of performing his past relevant work as a fast food restaurant cook.  At step five, the ALJ determined that Plaintiff was able to perform a significant number of other jobs, including fast food worker and

housekeeper.  (R. 25.)  The ALJ also determined that Plaintiff's statements regarding his limitations were not entirely credible.  (R. 25.)  As a result, the ALJ found that Plaintiff was not disabled; therefore he was not eligible for social security benefits.  (R. 26.)

## II.  Standard of Review

In reviewing an ALJ's decision, this Court does not try the case *de novo* or replace the ALJ's finding with the Court's own assessment of the evidence.  *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989).  The findings of the Commissioner of Social Security as to any fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Thus, the question before the Court is not whether a plaintiff is, in fact, disabled, but whether the evidence substantially supports the ALJ's findings.  *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether a plaintiff is disabled, the Court must affirm the ALJ's decision denying benefits.  *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996).

The Court gives considerable deference to the ALJ's credibility findings and will not overturn them unless the plaintiff can show that those findings are patently wrong.  *Urban v. Sullivan*, 799 F. Supp. 908, 911 (C.D. Ill. 1992).  When credibility determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, reviewing courts have more freedom to review them.  *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

## III.  Analysis

Plaintiff argues that the Court should remand this case for the following reasons:  (1) the ALJ improperly discounted Plaintiff's testimony regarding his symptoms; (2) the ALJ erred by not giving controlling weight to the opinions of Plaintiff's treating physician; (3) the ALJ erred by not considering the combined effect of Plaintiff's ailments when determining Plaintiff's RFC; (4) the ALJ erred by failing to ensure that the record was complete; (5) the ALJ erred at

Step Four when she found that Plaintiff could return to his past relevant work as a fast food restaurant cook; and (6) the ALJ erred at Step Five by failing to ask the VE whether his testimony was consistent with the *Dictionary of Occupational Titles* (hereinafter "DOT".)

### A.  Credibility and RFC Determination

Plaintiff argues that the ALJ erred by improperly discounting Plaintiff's testimony regarding his symptoms.  He specifically contends that the ALJ improperly discounted Plaintiff's complaints of pain and ignored the record demonstrating Plaintiff's inability to hold a job and access healthcare.  As a result, Plaintiff contends that the ALJ's RFC was unsupported and she improperly found that Plaintiff was not disabled.

Plaintiff first contends that his daily activities are sporadic and the ALJ should not use them to undermine his credibility.  Plaintiff notes that case law instructs that a plaintiff may be disabled while continuing general life activities.  *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006).

The Court agrees that the ability to perform some household activities does not necessarily indicate an ability to perform substantial gainful activity.  *Id.* (stating that courts should use care in "placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home").  Nevertheless, while courts have questioned whether doing housework really evidences that a claimant is able to work outside the home, the ALJ is allowed to consider whether the claimant's daily activities are inconsistent with his stated inability to work, in fact, she is required to do so.  *See* 20 C.F.R. § 416.1529(c)(3); SSR 96-7p. Furthermore, an ALJ is "not obliged to believe all [of a claimant's] testimony.  Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

**10**

In a recent decision, the Seventh Circuit stated that, in reviewing a credibility determination, a court "merely examine[s] whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213-14 (7th Cir. 2001)). "[O]nly when the ALJ's determination lacks any explanation or support . . . [will we] declare it to be patently wrong." *Id.* at 413-14.

Here, Plaintiff testified that, in addition to taking care of his daughter while his wife works, he does laundry, cooking, vacuuming and doing the floors, watches television, and reads, and he goes grocery shopping with his wife. The ALJ did not err by considering these activities when assessing credibility. Plaintiff's situation is unlike that of the plaintiff in *Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004), where the court chastised the ALJ for equating the ability to perform a few sporadic household chores with the ability to work eight hours a day for five consecutive days a week. Here, the ALJ discussed Plaintiff's daily activities as one facet of her credibility determination. In addition, while the plaintiff in *Carradine* pursued a wide variety of pain treatments, including heavy doses of strong drugs such as Vicodin, Toradol, Demerol, morphine, and surgical implantation in her spine of a catheter and a spinal-cord stimulator, here, Plaintiff takes aspirin and nonprescription ibuprofen for pain. Thus, the ALJ adequately explained her reasons for finding Plaintiff's statements regarding his pain not entirely credible and the Court cannot conclude that her finding was patently wrong.

Plaintiff also contends that the ALJ improperly discounted Plaintiff's complaints of pain because he was able to work after bypass surgery and he worked as a janitor until at least January 2003.[2] Specifically, Plaintiff contends that the ALJ failed to consider the sporadic nature of his employment history and whether Plaintiff could perform work at an acceptable level. This argument and Plaintiff's case law focus on the ALJ's finding regarding his RFC and disability, not his credibility.

---

[2]The record shows he worked as a janitor from April until August 2003. In January 2003, he was working as a dishwasher. (R. 107.)

**11**

In support of the argument that the ALJ erred by failing to consider the sporadic nature of Plaintiff's employment, Plaintiff cites *Oates v. Discovery Zone*, 116 F.3d 1161 (7th Cir. 1997), and *Rush v. McDonald's Corp.*, 966 F.2d 1104 (7th Cir. 1992), both of which involved claims of racial discrimination in employment under Title VII.  In both cases, the court considered the claims of employees whose *attendance* at work was sporadic and unreliable.  *Oates*, 116 F.3d at 1171 ("Reliability and promptness are important considerations in maintaining a work force."); *Rush*, 966 F.2d at 1115 ("It seems self-evident that an employer is acting with a legitimate, nondiscriminatory reason in terminating an employee who simply fails to report to work and does not adequately explain his absence" (quotations omitted)).

In contrast, here, Plaintiff contends that his employment was sporadic, not that he was unreliable about showing up for work.  Thus *Oates* and *Rush* do not support Plaintiff's argument.  Furthermore, the record contains little evidence explaining why Plaintiff only worked sporadically and the available evidence is contradictory.  For example, in October 2003, Plaintiff reported that he stopped working as a janitor because he could not do all the work so his employer kept cutting his hours until it told him he was not needed anymore.  (R. 106.)  At the hearing, Plaintiff testified he lost his janitor job because his employer lost the contract.  (R. 280.)  At the hearing, Plaintiff testified first that the only reason he could not work was because of his child; he does not have a babysitter.  Then he stated that it hurts too much because of the pain and muscles in his chest.  (R. 288.)  The "ALJ is entitled to presume that a claimant represented by counsel in the administrative hearings has made his best case."  *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988).  In light of the evidence before the ALJ, the Court concludes that she did not err by failing to give more consideration to the sporadic nature of Plaintiff's work history.

Plaintiff also states that employers are reluctant to hire an employee who is only sporadically available to work or who they know cannot work at a competitive pace.  However, the question of whether employers will hire an individual is not a factor in the disability analysis.

**12**

*Jones v. Shalala*, 10 F.3d 522, 525-26 (7th Cir. 1993) (distinguishing between ability to work and ability to find work).  While one can sympathize with the difficulties an individual may experience in finding satisfactory work that accommodates his limitations, the Commissioner is permitted to award benefits only to those who are incapable of engaging in any substantial gainful activity by reason of a medically determinable physical or mental impairment.  42 U.S.C. § 423(d); *see Jones*, 10 F.3d at 526.  Congress created a scheme for granting disability benefits to specified individuals and those who do not have a disability, as defined by Congress, cannot qualify for disability benefits.  *Id.*

Finally, Plaintiff contends that the ALJ improperly interpreted Plaintiff's failed attempt to work at Dairy Queen as evidence of substantial gainful activity.  The Court disagrees; there is no indication that the ALJ considered Plaintiff's Dairy Queen job as part of the basis for her finding that he was not disabled.

Based on Plaintiff's arguments above, Plaintiff contends that the ALJ erred when assessing his RFC.  In determining RFC, the ALJ must consider the entire record, including all relevant medical and nonmedical evidence.  *Diaz*, 55 F.3d at 306; 20 C.F.R. § 404.1545(a); 20 C.F.R. § 416.945(a).  Here, the evidence showed that Plaintiff had coronary artery bypass surgery in 2001 that resolved his heart condition.  (R. 207.)  After the bypass surgery, he was released to return to full activities in late summer.  (R. 202.)  He returned to work as a sewer and worked there until May 2002.  (R. 107.)  In August 2001, he was lifting a box and felt a crack in his sternum.  Dr. Lebenson advised him to avoid heavy lifting.  (R. 201.)  In September 2001, Dr. Lebenson noted that Plaintiff's sternum was improving and stated that he could return to work as long as he did not lift more than 20 pounds.  (R. 201.)  In January 2002, Dr. Lebenson noted continued sternal motion.  He diagnosed sternal dehiscence and sternal nonunion and recommended sternal rewiring.  (R. 200.)  In January 2002, Plaintiff had surgery to repair the wires.  During his recovery, Dr. Lebenson recommended that he limit lifting to ten pounds for six weeks.  (R. 230.)  In February and April 2002, Dr. Lebenson examined Plaintiff and reported

that he was doing well after the sternal rewiring and he had no complaints.  (R. 199-200.)
In April 2002, Dr. Lebenson gave Plaintiff a note stating that he could return to work with full
activities.  (R. 199.)  Plaintiff worked as a dishwasher from December 2002 to January 2003 and
as a janitor and groundskeeper for a rest area from April 2003 to June 2003.  (R. 107.)  While he
was working at the rest area, he hurt himself again.  (R. 281, Plaintiff's testimony).  The record
does not contain medical records regarding this injury, although Plaintiff alleges that his
disability began in June 2003.  In January 2004, Dr. Patel noticed a two-inch gap in his chest and
recommended that Plaintiff follow up with his doctor.  In May 2004, Plaintiff consulted
Dr. Dearnbarger whose clinic notes report that Plaintiff complained of two weeks of chest pain
and told the doctor that his chest bone is separating.  Plaintiff also complained of upper arm pain
and knee pain due to arthritis.  (R. 251.)  Dr. Dearnbarger ordered a chest x-ray, prescribed pain
relievers for Plaintiff's chest muscle pain and arthritis, and opined that Plaintiff needs to be on
disability.  In June 2004, Dr. Dearnbarger noted that Plaintiff's May 2004 chest x-ray was
completely normal, indicating that his sternal wires had not broken.  (R. R. 250.)  The doctor
assessed Plaintiff with musculoskeletal spasms in his chest and continued to prescribe pain
relievers for Plaintiff's chest pain and pain due to arthritis.  (R. 249-50.)  At the time of the
hearing, Plaintiff was taking only nonprescription medications as needed for pain.


    The record contained no medical evidence that Plaintiff's obesity limited his ability to
work.  Plaintiff testified that he does laundry, cooking, vacuuming, dishes (with a dishwasher),
and childcare for his 14-month-old daughter, as well as watching television, reading, and going
grocery shopping with his wife.  The record also contained no medical evidence that Plaintiff
had any functional limitations.  The Court's job is not to determine whether a plaintiff is, in fact,
disabled, but to decide whether the evidence substantially supports the ALJ's findings.  *Diaz*, 55
F.3d at 306.  Based on the evidence in this case, the Court cannot conclude that the ALJ erred by
determining that Plaintiff had the RFC to perform light to medium duty work, limited to simple,
repetitive job tasks associated with unskilled work.

**14**

### B.  Plaintiff's Treating Physician's Opinion

Plaintiff next argues that the ALJ erred by not giving controlling weight to the opinion of Dr. Dearnbarger, one of Plaintiff's treating doctors.  Specifically, Plaintiff contends that the ALJ erred by improperly relying on a report by Dr. Burris, a nonexamining doctor, to contradict Dr. Dearnbarger's opinion.

The Regulations provide that the findings of a treating doctor as to the severity of an impairment should be accorded controlling weight if well supported by the evidence and not inconsistent with other substantial evidence in the record.  *See* 20 C.F.R. § 404.1527(d)(2).  If the ALJ decides that the opinion is not entitled to controlling weight, she must reasonably articulate her reasons for doing so.  *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000).

As an initial matter, it is well settled that a determination that a claimant is disabled is an issue reserved to the Commissioner.  20 C.F.R. § 416.927(e)(1).  The Regulations state that "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id.*  Moreover, opinions on issues that are reserved to the Commissioner are not "medical opinions."  20 C.F.R. § 416.927(e).  Therefore, the ALJ does not have an obligation to consider such statements in the same manner that she considers medical opinions.  *See* 20 C.F.R. § 416.927(b) (stating that "[i]n deciding whether you are disabled, we will always consider the *medical opinions* in your case record together with the rest of the relevant evidence we receive" (emphasis added)), and 20 C.F.R. § 416.927(d) (describing how the ALJ weighs medical opinions).

In support of his position that the ALJ improperly rejected Dr. Dearnbarger's opinion, Plaintiff cites an unpublished Seventh Circuit court case, *Oakes v. Astrue*, in which the court stated that "a contradictory opinion of a non-examining physician does not, by itself, suffice" to provide the evidence necessary to reject a treating physician's opinion.  *Oakes v. Astrue*, 258 Fed. App'x 38, 44-45 (7th Cir. 2007) (unpublished) (quoting *Gudgel v. Barnhart*, 345 F.3d 467,

470 (7th Cir. 2003)).  In that case, the Seventh Circuit court noted that the ALJ had erred by giving no weight to a treating doctor's report on the ground that the doctor had opined on issues reserved to the Commissioner.  *Id.* at 44.  The court explained the treating physician rule, noting that it would uphold an ALJ's decision not to give controlling weight to a treating physician's opinion where that physician did not have the requisite expertise, familiarity with the patient, or longitudinal relationship, or where the opinion was inconsistent with objective medical evidence. *Id.*

More recently, the Seventh Circuit discussed the treating physician rule in *Hofslien v. Barnhart* without referring to *Gudgel*.  *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). In that case, similar to this one, the court rejected the plaintiff's argument that it was erroneous for the ALJ to refuse to give controlling weight to a treating doctor's opinions because they were inconsistent with evidence from physicians who had not treated or even examined the claimant. *Id.* at 376.  The court held that the weight to be given to testimony by a treating doctor depends on circumstances and, if the record contains well-supported evidence that contradicts his opinion, even if it is that of nontreating, nonexamining physicians, then the treating doctor's evidence is not controlling and it is just one more piece of evidence to consider.  *Id.* at 377.  As the district court noted in *RJM ex rel. Moore v. Astrue*, No. 1:07-cv-385-SEB-TAB, 2008 WL 833194, \*6 (S.D. Ind., Mar. 27, 2008) (unreported), *Hofslien* is at odds with *Gudgel* and they have not been directly reconciled.  Moreover, the Seventh Circuit has cited the *Gudgel* case in unpublished cases since the *Hofslien* decision was issued.  *See Oakes*, 258 Fed. App'x at 44-45 (unpublished); *Taylor v. Barnhart*, 189 Fed. App'x 557, 562 (7th Cir. 2006) (same) (unpublished).

The Regulations codified the treating physician rule at 20 C.F.R. § 416.927(d), directing that more weight should generally be given to well-supported treating and examining sources than to nonexamining sources.  The rule then lists various factors that the administrative law judge should consider, such as how often the treating physician has examined the claimant,

16

whether the physician is a specialist in the condition claimed to be disabling, and so forth.  The checklist is designed to help the administrative law judge decide how much weight to give the treating physician's evidence.  *Hofslien*, 439 F.3d at 377.  In *Hofslien*, the court ultimately concluded that when evidence in opposition to the presumption is introduced, the rule drops out and the treating physician's evidence is just one more piece of evidence for the ALJ to weigh, based on the factors listed in the rule.  *Id.*  Based on this reasoning, the determination whether a physician's opinion is inconsistent with other substantial evidence in the record requires a case-by-case assessment.  *Id.* ("the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances").

Based on the language in the Regulations, the Court finds the *Hofslien* court's reasoning regarding the treating physician rule to be more persuasive, especially in light of the Regulation's treatment of matters reserved to the ALJ, such as statements by doctors that a claimant is unable to work.  Moreover, the Seventh Circuit court has stated that "[i]t is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation."  *Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) (citing 20 C.F.R. § 416.927(f)(2)(i) stating that "State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation").

Here, the ALJ decided that Dr. Dearnbarger's opinion did not merit significant weight.  She explained that the "opinion of this short term treating doctor is contrary to medical evidence from other medical sources and is contradicted by the claimant's own description of his daily activities and his ability to perform exertional work activities."  (R. 25.)  The ALJ noted that no other treating, examining, or reviewing physician had reported that Plaintiff was unable to work, and no doctor had limited Plaintiff from performing light to medium duty work.

**17**

Plaintiff attempts to refute this statement by referring to Dr. Lebenson's September 2001 report that Plaintiff could not lift more than twenty pounds (R. 201) and his post-surgery report dated January 2002 restricting Plaintiff from lifting over ten pounds for six weeks (R. 230). The first report occurred before Plaintiff underwent surgery to repair his sternal nonunion and dehiscence and the second report was written immediately after surgery. Following the surgical repair, Dr. Lebenson indicated in April 2002 that Plaintiff could return to work and to full activities. (R. 199.) Thus, contrary to Plaintiff's argument, the record contains opinions that conflict with Dr. Dearnbarger's opinion that Plaintiff was unable to work. Furthermore, Dr. Lebenson was a treating doctor, rather than a nonexamining doctor. Accordingly, the Court concludes that the ALJ did not err by refusing to give controlling weight to Dr. Dearnbarger's opinions.

Plaintiff also takes exception to the ALJ's statement that Plaintiff admitted he was able to lift 40 pounds at work after heart surgery, arguing that the ALJ should not use evidence that Plaintiff injured himself while lifting heavy boxes to prove he could lift heavy boxes as part of his job. It appears that Plaintiff mistakenly believed the ALJ was referring to the surgery to repair sternal wires, which does not involve the heart itself. However, it is clear from the context of the statement that the reference to *heart* surgery refers to Plaintiff's bypass surgery and the ALJ considered Plaintiff's ability to lift boxes as one indicator that his heart condition had resolved. Thus, Plaintiff's argument is not persuasive.

### C.  The Combined Effect of Plaintiff's Ailments

Plaintiff next argues that the ALJ erred by not considering the combined effect of all of Plaintiff's ailments when determining Plaintiff's RFC. *See Clifford*, 27 F. 3d at 873 ("The regulations require the agency to consider the combined effect of all of the claimant's ailments, regardless of whether 'any such impairment, if considered separately, would be of sufficient severity'.") (quoting 20 C.F.R. § 404.1523). Specifically, he contends that the ALJ failed to consider the effect of Plaintiff's obesity on his sternal dehiscence and arthritis.

18

Plaintiff did not specifically claim obesity as an impairment either in his disability application or at his hearing.  Nevertheless, Plaintiff is 5 feet, 11-1/2 inches tall, and weighed 258 at the hearing.  Several of Plaintiff's health care providers noted that Plaintiff was obese and these references to his weight in his medical records were sufficient to alert the ALJ to the impairment.  *See id.* (holding that ALJ should have been alerted by "numerous references in the record" to the claimant's weight problem).

The ALJ is limited to considering the evidence in the record.  20 C.F. R. § 404.1512(a) (stating that an ALJ need only consider impairments a claimant says he has, or about which the ALJ *receives evidence*).  Plaintiff has not cited any evidence in the record regarding any effects Plaintiff's obesity had on his medical conditions.  Nurse Mangers noted that he should continue on a low fat, low cholesterol diet, but the record contains no discussion of how his weight might be contributing to his pain or limitations.  Furthermore, Plaintiff does not specify in his memorandum how his obesity impairs his ability to work, but states only that the ALJ erred by failing to consider it.  Absent any discussion or opinions by medical sources regarding the effects of Plaintiff's obesity, the ALJ cannot be criticized for not articulating the effects of obesity on Plaintiff's ability to work.  *See Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir. 1996) (stating that "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings").

The Seventh Circuit court stated in *Prochaska v. Barnhart* that, "[a]lthough the ALJ did not explicitly address Prochaska's obesity, he specifically predicated his decision upon the opinions of physicians who did discuss her weight."  *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).  In *Skarbek v. Barnhart*, the Seventh Circuit court noted that "the ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of Skarbek's obesity.  Thus, although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions."  *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

**19**

In her decision, the ALJ expressly discussed the evidence related to Plaintiff's pain and limitations.  *See* R. 22-25.  As noted above, the ALJ relied on the opinions of doctors who acknowledged Plaintiff's obesity and arthritis, and she subsequently adopted the limitations suggested by those doctors.  As a result, obesity was indirectly factored into her decision.  Accordingly, the Court cannot say that the ALJ erred by failing to consider Plaintiff's obesity.

### D.  Whether the Record was Complete

Plaintiff next argues that the ALJ erred by failing to ensure that the record was complete.  Specifically, he contends that the ALJ erred by ignoring Plaintiff's financial circumstances and using the absence of treatment "to justify a skeptical attitude towards Plaintiff's complaints of arthritis and chest soreness."  (#12, p. 16.)

As Plaintiff points out, the record contains evidence that Plaintiff had financial difficulties and the Court need not repeat that evidence here.  However, other than Plaintiff's inability to buy Naprosyn for his chest pain, the record contains no evidence[3] that Plaintiff's financial straits prevented him from obtaining treatment.  Furthermore, when Plaintiff informed Dr. Dearnbarger that he could not afford to buy Naprosyn, the doctor gave him an alternative medication free of charge.

Plaintiff also contends that the fact that the ALJ considered Plaintiff's lack of treatment to support her decision instead of seeking additional evidence shows that she disregarded her "duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable."  *Barnett v. Barnhart*, 381 F. 3d 664, 669 (7th Cir. 2004).

---

[3]The Court is aware that Plaintiff testified that he had foregone having his "cholesterol cataracts" removed because he could not afford it.  However, Plaintiff does not allege disability or any limitations based on his vision.  As a result, this testimony is not germane.

**20**

The ALJ has a duty to develop the record. *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991).  Social Security proceedings are inquisitional rather than adversarial in nature and the ALJ must investigate the facts and develop arguments for and against granting benefits.  *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000).  However, she is not required to act as plaintiff's counsel. *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994).  According to the Regulations and the Seventh Circuit court, an ALJ must recontact medical sources "only when the evidence received is inadequate to determine whether the claimant is disabled."  *Skarbek*, 390 F.3d at 504; 20 C.F.R. § 404.1512(e).  Thus, the relevant question is whether the medical evidence available to the ALJ provides a sufficient basis for a decision.  Judicial review of administrative decisions is deferential, and courts must respect the authority of an ALJ to decide how much evidence is necessary in a given case.  *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993) ("[I]t is always possible to do more.  How much evidence to gather is a subject on which district courts must respect the [Commissioner's] reasoned judgment.").

Plaintiff contends that his financial situation "precludes access to medical care, so Plaintiff necessarily lacks complete documentation of his physical limitations which would ensure a proper evaluation of his condition at a listing level."  (#12, p. 19.)  Plaintiff has not developed this argument.  "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand."  *Binion v. Shalala,* 13 F.3d 243, 246 (7th Cir. 1994).  This is particularly true in light of the fact that the claimant, not the ALJ, bears the burden of presenting medical evidence of an impairment, which means that the claimant bears the risk of uncertainty.  *Eichstadt v. Astrue,* 534 F.3d 663, 668 (7th Cir. 2008); 20 C.F.R. § 404.1512(a).

Here, the record contains no evidence that Plaintiff's financial hardship prevented him from receiving medical care.  The record also shows that, although Plaintiff's doctors acknowledged that Plaintiff complained of arthritis, they did not recommend treatment other than nonprescription pain medication.  Furthermore, Plaintiff was represented by counsel at the hearing, yet, other than testimony about his "cholesterol cataracts," his attorney did not elicit any

testimony from Plaintiff about his financial situation or whether he needed further treatment for any of his impairments.  As noted above, when a claimant is represented by an attorney at the administrative proceeding, the ALJ is entitled to presume that he has made his best case.  *Sears*, 840 F.2d at 402.  Under these circumstances, the Court concludes that the ALJ did not err by failing to do more to develop the record.

### E.  The ALJ's Step Four and Five Findings

#### 1.  Step Four

Plaintiff next argues that the ALJ erred at Step Four when she found that Plaintiff could return to his past relevant work as a fast food restaurant cook.  Specifically, Plaintiff contends that the ALJ failed to properly examine the record or question Plaintiff about his past work to see if it met the criteria of "past relevant work."  He also contends that the ALJ erred because a fast food restaurant cook is a semi-skilled job with an SVP of 5, therefore it does not satisfy the RFC determination limiting Plaintiff to simple, repetitive job tasks associated with unskilled work and an SVP of two.

Based on the RFC limiting Plaintiff to unskilled work, it appears that Plaintiff may be correct regarding the ALJ's Step Four determination.  However, because the ALJ reached the same decision (finding Plaintiff not disabled) at Step Five, this error is harmless.  *See Keys v. Barnhart*, 347 F.3d 900, 994-95 (7th Cir. 2003) (applying harmless error analysis to claim for disability benefits).

#### 2.  Step Five

Plaintiff argues that the ALJ erred at Step Five because she failed to ask the VE if his testimony was consistent with the DOT.  He contends that the error is not harmless because the DOT shows that the fast food restaurant worker job requires skills that are beyond the level of simple, repetitive tasks.  As to the housekeeper job, Plaintiff contends that it requires more

"working under specific instructions and at a consistent standard and pace" (#12, p. 22), and that reasoning and language levels of two require dealing with detailed instructions.

An ALJ has an affirmative duty to ask a VE if the evidence that the expert has provided about job limitations conflicts with the job requirements listed in the DOT, and if the evidence appears to conflict, the ALJ must ask the vocational expert to explain the conflict.  *Ketelboeter v. Astrue*, --- F.3d ---, 2008 WL 5205816, *5 (7th Cir. Dec. 15, 2008) (citing *Prochaska*, 454 F.3d at 735).  Here, as the Commissioner concedes, the ALJ did not fulfill her duty to inquire.  Nevertheless, the error is harmless because the DOT's descriptions of the jobs the VE discussed do not conflict with the hypothetical limitations given by the ALJ.  *See id.*

The DOT uses SVP ratings to classify jobs into certain skill levels.  According to the Regulations, unskilled work corresponds with an SVP of 1 or 2.  20 C.F.R. § 416.968; SSR 00-4p.

The DOT lists an SVP for each described occupation.  The DOT descriptions for the fast food restaurant worker and housekeeper jobs do not conflict with the hypothetical limitations provided by the ALJ.  Both have an SVP of 2, thus constituting unskilled work.  Both are light exertional level jobs.  As a result, they satisfy the limitations of the RFC.  Accordingly, the ALJ did not err in her Step Five analysis.

## IV.  Summary

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment or Remand **(#11)** be **DENIED**.  The parties are advised that any objection to this recommendation must be filed in writing with the Clerk within 10 working days after service

of a copy of this recommendation.  *See* 28 U.S.C. 636(b)(1).  Failure to object will constitute a waiver of objections on appeal.  *Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538, 539 (7th Cir. 1986).

ENTER this 3rd day of February, 2009.

_____ s/ DAVID G. BERNTHAL _____
U.S. MAGISTRATE JUDGE